171077, Lorenzo v. the Securities and Exchange Commission. Mr. Heim. Mr. Chief Justice, may it please the Court, in Janus Capital, this Court held that only the maker of a misstatement can be held liable for that misstatement under Section 10b and Rule 10b-5b. The Court below correctly held that Petitioner Frank Lorenzo was not the maker of the statements that are at issue in the two e-mails in this case. However, the Court below erred when it held that Lorenzo could nevertheless be liable for those very same misstatements under a theory that by producing and sending those statements, he engaged in a deceptive act, artifice to defraud, or practice for purposes of liability under Section 10b, Rule 10b-5a and C, and Section 17a-1. For three reasons, Lorenzo's actions do not support liability. First, permitting liability under Rule 10b-5a and C and 17a would allow plaintiffs to sidestep this Court's holding in Janus and the limitations that were placed on misstatement liability, and it would allow plaintiffs to creatively relabel their inadequate misstatement claims as claims for deceptive devices and acts. The result is contrary to Janus and would render Rule 10b-5b a nullity.  Sotomayor, Janus was a private cause of action, correct? Yes, Your Honor. Under 10b-5. Yes, Your Honor, under 10b-5b. I understand what Janus said, but I don't know how it squares with 17a, and you swept 17a in. 10b-5 uses the phrase, to make any untrue statement. But 17a says, to obtain money or property by means of any untrue statement of a material fact. That seems dramatically different to me. 17a is a government provision, meaning only the government can sue under 17a. Why should we be treating the two identically? I don't know that anywhere in your brief you explain that. I know that we've had made general statements that the two inform each other, but certainly not on this critical point, because Janus was based explicitly on the making language of 10b-5b. That's true, Your Honor. The subsection that you quoted is actually from Section 17a, subsection 2, which is not, was not charged by the SEC, in which Mr. Lorenzo was not accused of violating. And we agree that subsection 2 may be a better way for the SEC to proceed if they are going to try to hold Petitioner liable as a primary violator, because it almost fits very closely here, because that's the equivalent of Rule 10b-5b. But the same point can be made, Mr. Heim, with respect to 10b-5a and c, and also with respect to 17a-1 and 3, right, that the idea is, is, look, look, Janus was a decision that it was a very textual decision. It's, it interpreted the word make. It's, it had lots of examples from real life about who makes statements and who doesn't make statements, and neither a or c in 10b-5 has the same language in it. Well, Justice Kagan, 10b-5b only addresses misstatements. The other categories in 10b-5a and 10b-5c are really conduct-based language. They get to acts and practices and courses of business. And our view is that a and c cover quite a different type of law. So you think that a and c are sort of any, like, everything except misrepresentations or omissions. Is that your position? That's essentially our position. We don't dispute that there can be cases where you have both misstatements and deceptive conduct. But as Desai said in the Circuit Court of Appeals, is that the judiciaries always recognize the difference between deceptive conduct and deceptive statements. So take this case. Mr. Lorenzo here sent false financial information to potential investors. He was, when he did that, he was the head of the Investment Banking Division, and he sent this false financial information. And you conceded, in your yellow brief, you conceded quite a few times that he did so with an intent to defraud. So he presses send, and an e-mail is sent that contains false financial information. And I'm looking, for example, I'm looking at the language of 10b-5c. Do you think he has not engaged in an act which operates as a fraud? We do, Your Honor, for several reasons. One, for example, we do not think that he engaged in any conduct that violated 10b-5c, because in order for 10b-5b to have any meaning, it would be But I guess I'm wondering, just take, I understand that argument, and it's, I think, a serious argument. But pretend that 10b-5b was not in the statute for just a second, and you're entitled to come back to it. But just pretend it wasn't in the statute. Is the behavior that was charged here and that you've conceded was done with an intent to deceive, is that engaging in an act that would operate as a fraud? No, Your Honor, for a couple of different reasons. One, Congress has set up a statutory scheme for what constitutes aiding and abetting liability. And one of the key distinguishing features between primary liability and aiding and abetting is the concept of substantial assistance to a primary violator. In this case, Mr. Lorenzo just sent an e-mail at the direction of his boss with content that was provided by his boss to the recipients. Ginsburg-Gilbert, I think all the content, I mean, the e-mail begins with a summary. It says the banking, investment banking division is summarizing key points of the debenture offer. And then there's the part that allegedly was cut and pasted. But it starts out with a reference to what the investment banking division is doing. And it's signed by the head of that division. So it's not simply conveying what the boss told Lorenzo to send. The whole thing wasn't cut and pasted, just a portion of it, isn't that so? Well, Justice Ginsburg, the court below found that there was sufficient attribution in this e-mail to Greg Lorenzo, because it does start off by saying that it's being sent at the request of Greg Lorenzo. And the record in the D.C. Circuit, after looking at the commission's findings, found that Frank Lorenzo was not the maker of the statements in the e-mail. And one of the reasons for that finding was because it was attributed at the start of the e-mail to Greg Lorenzo. But, Mr. Hyam, if I understand your position, it's irrespective of that fact. In other words, suppose that Mr. Lorenzo had made the e-mail, had come up with the e-mail himself. If I understand your position, you would say, well, it's still not part of 10B-5C because that's a misrepresentation. And misrepresentations can only be charged under 10B-5B. Isn't that what you would say? I thought that that was what you just told me. Well, no, that's slightly different than our hypothetical, because the question is really whether Rule 10B-5B misstatements can be a part of other subsections. And in that particular instance, if Mr. Lorenzo had drafted the e-mail, there's certain other conduct. And our position is that in order to be held liable for 10B-5A and 10B-5C, Mr. Lorenzo would have to have engaged in something in addition to just mere misstatements. Did he make a misstatement? Did he personally make a misstatement? I think you – I thought your answer was no. He did not make a misstatement. No, he didn't, and that was what the D.C. Circuit found. Okay. So then why doesn't it fall within C? Why does your rule that if it's a misstatement, it can't fall within anything other than B help you when you argue that he didn't make a misstatement? He did something else. So why doesn't it fall within C? Because Mr. Lorenzo didn't engage in any additional deceptive conduct other than making – once he was deemed to be not the maker of the statement, our view is, consistent with the majority of circuits that have considered this question, is that some other inherent deceptive conduct would have to be engaged in by Mr. Lorenzo. Well, just take the language of C. Why doesn't his conduct fall squarely within the language of C? Well, because C talks about conduct. It's a type of fraud that's categorically different than merely misstatements or omissions. You say C can't include any verbal conduct, has to be something else. I don't quite know how you're going to engage in a fraud without saying some words. No, Your Honor, that's not our position. There can be cases where there's both conduct and misstatements, which C would cover. Our position is when you have a case like this one, when there's only misstatements and no deceptive conduct, that in order to allow a plaintiff to repackage those claims as claims under A and C would render 10b-5b meaningless. And also, the D.C. Circuit set the bar very low. If sending an e-mail that was prepared by somebody else constitutes enough of an action to constitute primary liability, it would really leave no room for any sort of aiding and abetting liability. It would convert anybody that perhaps gives some sort of substantial assistance to a primary violator. I don't see why you need to get into aiding and abetting. He's a principal under C. He did the act that is described in C. It's not necessary to ask, all right, somebody, he didn't do the act that is described in C, but he aided and abetted somebody else who did the act. Well, there's an important distinction to be drawn there, because the concept of primary liability really ties into an act of the statute and the regulation discusses concepts of using and employing, which implies a certain level of active conduct. Here, in this case, we have two e-mails that were sent moments apart, and the content was essentially prepared by his boss, Greg Lorenzo. I'd like to go back to my question on that point. I'm looking at Petitioner's Appendix 107. It sets out one of the two e-mails. And then there's a portion that's underlined, and I thought that that is what came from the boss, but the first part, it does say, at the request of, but it says, the debenture offering. No, Your Honor. The record in the holding below was that the e-mail as a whole came from the boss, Greg Lorenzo, not from Petitioner, and that Petitioner Frank Lorenzo was instructed by Greg Lorenzo to send the e-mail out to two clients that were clients of his boss. I'm sorry, I'm having a problem from the beginning. Once you concede, which I think you did, that you're not challenging that your client acted with an intent to deceive or defraud, that you weren't challenging the D.C. Circuit's conclusion to that effect. Is that correct? Yes, Your Honor. I don't understand, once you concede that mental state, and he has the act of putting together the e-mail and encouraging customers to call him with questions, not to call his boss with questions, how could that, standing alone, give away your case? I mean, that makes him both a maker of a false statement, whether his boss shared it or not, and I know the courts below thought differently, but it's also engaging in an act, practice, or course of conduct which operates or would operate as a fraud to deceive upon any person, whether he was a maker or not. He was encouraging the customers to call him directly about buying or buying what was being offered. Well, Justice Sotomayor, I think you're tying into what our position is with respect to what more would be necessary to convert over Mr. Lorenzo into a primary violator, because if those customers had in fact called Frank Lorenzo, which they didn't, and he would then have repeated the statements or he would have engaged in some other type of deceptive conduct, but merely producing and sending the e-mails is such a low bar that the D.C. Circuit set, so. Kagan, we've made very clear in Central Bank that this idea of primary and secondary, if your actions fit within the language of the particular provision of the statute that you're charged on, then you're a primary violator of that provision, right? And even if, given some other language, you wouldn't be, or given, you know, some more, you know, some other understanding of what it means, if you fit within the language and you violate that language, you're a primary violator. That's what we said in Central Bank. And I guess the import of these questions is he fit within that language. He engaged in an act that operated as a fraud. Well, Justice Kagan, our view is that you can't take that language in a vacuum. You have to consider it in context of the statutory framework that Congress has put into place for aiding and abetting liability, because if you were to find that Frank Lorenzo engaged in a primary violation here, it would undermine Congress' statutory intent for setting up in Section 20 of the Exchange Act exactly who is an aider and abetter, and the key distinction is somebody who provides substantial assistance. Perhaps here, the SEC … Well, because that is useful, because there are some people who don't fall within the language of the statute and nonetheless can be charged as an aider and abetter under Section 20 if the SEC does it, if it's not a private action. But what we said in Central Bank is, look, if you do the thing that's, that is described in a particular subsection of this statute or of the, or of 10b-5, the rule that you have to consider as to that subsection. Our view is that Mr. Lorenzo did not engage in conduct sufficient to form a violation of 10b-5c, for instance. When you look at the case law, it has a much higher standard for what constitutes violations of those provisions. So in order for Mr. Lorenzo to have become a primary violator, he would have had to engage in more active misconduct if he, for instance, would have set up a phony purchase order to substantiate one of the points in the e-mail. If he were to go onto the Internet and produce content under phony aliases, these are all the same. Kagan. Well, those would have been bad, too, but I guess I just don't get why the act that he did engage in is not an act that operates as a fraud. Well, for two reasons, Your Honor. One, sending the e-mail does not rise to the level of using or employing a fraudulent device under our view. And number two. Well, that's, you're quoting me, A, and I was using the language of C. Although, honestly, one could just as well use the language of A, because we've said that a fraudulent device is just a scheme to defraud. Well, Your Honor, it has a certain level of intentionality behind it in terms of Mr. Lorenzo. So sending an e-mail in and of itself would not, in our view, rise to the level of employing or using a deceptive device. And, you know, an additional related point to that is that this Court's holdings in Central Bank, Santa Fe, and other cases confine Rule 10b-5b to the boundaries of Section 10b. So in other words, Rule 10b-5 cannot go beyond the boundaries of Section 10b in terms of proscribing fraudulent conduct. And that line of cases says in order for conduct to be fraudulent, it has to be either deceptive or manipulative. And the Chiarella case stands for the proposition that unless there's a misstatement or an omission or some sort of manipulative trading, that those are essentially the three categories of fraud that are proscribed by Section 10b. Kagan. Kagan. I have to say I think that that works against you, that principle, because you're right that all of 10b-5 is coming off of 10b, which refers only to manipulative or deceptive devices or contrivances. But it's well understood that misrepresentations or omissions are manipulative or deceptive devices or contrivances, and just those misrepresentations alone. I mean, if some of your arguments were correct, if you took them to their logical extent, you would have to say that misrepresentations and omissions don't fall within that language of 10b. Well, Justice Kagan, that's when you get into the importance of the Janus decision, because once Frank Lorenzo is determined not to be the maker of those misstatements, in our view, it takes him out of the category of misstatements. Kagan. I understand, but your argument would also take out the makers of those misstatements. Not necessarily, because the makers of the misstatements would have primary liability. We're not contesting that here, and it's not one of the issues that's at issue. Our view is that once Mr. Lorenzo is deemed not to be the maker of the misstatement, the court then would look to see, well, is there an omission, which there isn't here, is there manipulative training? Roberts. I thought you said just a short while ago that simply sending an e-mail is not enough. Yes, Mr. Chief Justice. So then your distinction depends solely on the content of the e-mail? In other words, it gets down to the basic question of whether or not Frank Lorenzo was involved at all in the drafting? So for you to prevail, we have to understand him, as I guess he argued at one point, not even reading the e-mail. No, Mr. Chief Justice. I don't think in order for us to prevail, you have to make that finding. Our position is that the court should establish the test that Mr. Lorenzo's conduct has to be something that's inherently deceptive, and that would be sufficient to push him over the line from being somebody who is not the maker of the misstatement, but could still somehow be held liable under Rules 10b-5a. So why wasn't it? I mean, I thought he sent an e-mail around to people and said this company, which he knew was worthless from their filing, has $10 million in assets, which he knew wasn't true, and also had $43 million to back it up, which he knew wasn't true. And his defense was, well, I only sent it because my boss told me, the other Lorenzo. And so, fine, then he's not the maker, but it seems pretty bad. I mean, he'd been working with this company for quite a long time, and he's investors, and so what is it that makes this just aiding and abetting? Maybe he didn't make the statement, but he was sure a big deal participant. Yes, Justice Breyer. And to be clear, Mr. Lorenzo acknowledged in the record of the trial that he made a mistake, and under our position, Mr. Lorenzo would not get off scot-free. There's very stringent remedies against aiders and abettors, as well as, as referenced before, Section 1782, which is not at issue here, would seem to perhaps fit much better, because it's a subsection that deals with obtaining money or property under false statements, and that doesn't raise the same Janus issues, and that doesn't raise the distinction. Sotomayor That's what I'm having trouble with. Whether 1782 was charged or not is irrelevant, because the way 17A is structured, it's not controlled by Janus at all. Because it doesn't talk about making statements. It talks about obtaining money or property by statements. There's no reason why we should limit, under Janus or otherwise, limit the way we would limit 3 from or 17A1 or 3 from taking their natural meaning. If you make a materially false statement intentionally, which you conceded he did, then he engaged in a transaction, practice, or course of business which operated or would operate as a fraud. Well, Justice Sotomayor, just to be clear, our position, as was the D.C. Circuit, was that Mr. Lorenzo was not the maker of these statements. Sotomayor He wasn't the maker, but he had the scienter. And you're not disputing that. Correct. But that's not the test in terms of whether he would fall into one category or the other. And this Court in U.S. v. Nataplin was addressing section 17A and its different subsections, and it said that each subsection prohibits a different type of conduct. And in order to give meaning to each of the different subsections, it just cannot be read in such a way to say that every claim, for instance, for misstatements could easily be brought under 17A1 or 17A3. Well, you're suggesting that because B refers specifically to misrepresentations, that those misrepresentations do not fall within A or C. But I guess to understand that view of the Act, which is everything prohibits something different, you would have to, for example, think that A and C are mutually exclusive. What's the difference between A and C? A and C, Your Honor, are closer together. They both deal with fraud. They both deal with deceptive conduct. The Court doesn't have to reach the issue as to whether or not there's a difference between A and C. Kagan. Kagan. Kagan. But we have to understand what the statute is about. You're presenting one view of the statute, which is that each of these or the rule, which is that each of these different sections is apart from each of the rest, that each prohibits a different thing from the other. And I guess I'm suggesting a different view of the statute, which is — which A and C make pretty clear that these are very overlapping. One overlaps the other, overlaps the other. They're all meant to essentially address the same thing. This is a kind of belt-and-suspenders statute, where it's like we're going to find every possible way to say this thing in order to make sure that fraudulent acts are covered. Well, Justice Kagan, we don't dispute that there could be some overlap between the different subsections. But here, in order to sustain the D.C. Circuit, it would really be a wholesale elimination of one of the subsections, which is Rule 10b-5b. And that would be contrary to the holding of Corley v. United States, where the Court is — the purpose is to find meaning for each of the different subsections and not read it in a way that would make one of them redundant. But then I'm going to ask you again, what's the difference in meaning between A and C? Well, they both deal with conduct, and I don't know if there is a real meaningful difference between A and C, because they both have very similar language between the two. But I think the Court can, as the lower courts have, they can consider A and C as one type of fraud, which is conduct-based, because the language is very similar, the plain language of A and C. And the courts below, in the majority opinions that we cite, do treat A and C as very similar, as distinct, and the majority position is, is that plaintiffs should not just be allowed to repackage inadequate 10b-5b claims, which are just the misstatement claims, and say that those misstatements standing alone can somehow be enough to satisfy the language of A and C, which is a conduct-based fraud. And if the Court was to uphold that view, it would render 10b-5b meaningless, and I think also by implication in Section 17a-2, which 10b-5b was drawn on. So there's a lot of problems with sustaining the Court's opinion below with regards to that. Ginsburg. Can I ask you just some basic questions? There's no doubt, is there, that at the time this e-mail was sent, Lorenzo knew full well that the company was worthless? Well, we did not challenge the Center finding, which was also conceivably, and as set out there, a recklessness finding. Ms. Lorenzo testified he did not see the disclosures in the earlier SEC filings, but we're not contesting Center, which could be recklessness. And the record is a little confusing. At one point, the ALJ says he didn't even look at the e-mail. At another point, he himself testified that he authored the e-mails. Well, the – well, there is inconsistencies in the record, but overall, the import of the testimony taken together was such that it was Greg Lorenzo that was the creator of the e-mail and the maker of the statements, and the SEC has not challenged that holding either on their case. And I would like to reserve the rest of my time for rebuttal if that's okay with the Court. Thank you, counsel. Mr. Michel. Mr. Chief Justice, and may it please the Court. Petitioner's decision to send e-mails that grossly misrepresented the financial prospects of his client and to give illusory promises designed to deceive investors into backing a business that he knew was failing constitute a quintessential securities fraud. His conduct falls within the plain text and the common sense meeting of Section 17a of the Securities Act, Section 10b of the Exchange Act, and subsections a and c of Rule 10b-5. It sounds like the argument your client made in Janus that was rejected by this Court. Well, Mr. Chief Justice, in Janus, the provision at issue was 10b-5b, and the government is no longer pressing a 10b-5b charge in this case. The Janus opinion from start to finish is very clear that it's interpreting the term make in Rule 10b-5. But the essential argument on the other side is that the argument you're now pressing is just an end run about Janus. It would render Janus essentially inconsequential. All you do is repackage what would have been a 10b charge under 17 or 10b-5a and c. Well, Your Honor, a couple of points in response to that. First of all, Janus will still have significant meaning, especially in private actions, because Janus limits the number, limits who can come within 10b-5b. And the Janus opinion was careful to distinguish between aiders and abettors who are sort of background actors. The speechwriter example is the one that the Court gave, preparatory actors who aren't themselves employing a device under a or engaging in an act under c, but are instead merely supporting that. So our contention is not that everyone who has some involvement in a statement will somehow become primarily liable under a and c and section 17a. As Justice Kagan said, Central Bank was very clear that the test for primary liability is simply that the defendant has to satisfy all the elements of the statute. And Central Bank says expressly that even if somebody is a secondary actor in some colloquial sense, like a lawyer or an accountant, that person can still be primarily liable under the securities laws if that person satisfies all of the statutory requirements, as Petitioner did here, and as I don't take him to seriously contest. His argument seems to be that subsection B of 10b-5 has some sort of field preemptive effect in that it serves as the sole vehicle for bringing claims, securities fraud claims, involving State parties. Roberts, that's not how I understand the argument. As I understand the argument, it goes something like this, and it proceeds in about five or six steps, I think. First, Central Bank says we've got to look at the statute. Rule's nice, but let's look at the statute. So we look at the statute, and it prohibits manipulative or deceptive devices, essentially. Well, no manipulation is alleged here, just deception. Are we on the same page so far? Gannon, Yes, Justice Gorsuch. Roberts, Okay, all right. Deception, I think, a fraud. Kagan, Well, are you? Because there's another statute, too, which is section 17. Gannon, That's true. I took Justice Gorsuch to be regretful. Roberts, I'm just talking about 10b, 10b at the moment. We can get to 17 in a minute. All right. So we're on the same page. And when we talk about deception or fraud, we have Menzray and Actus Reis. He's saying I'm not contesting Menzray, just Actus Reis. Okay, fine. When we get to Actus Reis, no omission is alleged, just an action. You could have an Actus Reis, a fraud by act or omission. Only acts charged here. And the only act seems to be this statement issued to potential investors. And we have a finding from the D.C. Circuit that it wasn't made, that act wasn't made. That statement wasn't made by this defendant. Now, we could maybe overturn that, I suppose, and you could argue that. But if he didn't make the act of fraud that's alleged, then doesn't that necessarily imply he's substantially assisted, if anything? I think that's the argument. So I think it was maybe around step 4 that I disagreed with you, and that is, I think you said that he didn't make the act. But I do think it's important to distinguish, to your point on the text of the statute and the rule, what the D.C. Circuit found was that he didn't make the statement, and therefore he didn't fall within the text of 10b-5b. But the only act of fraud, you have to have an act that deceives someone else. And the only thing that deceived anybody, allegedly here, were these e-mails, right? And he didn't make them. Well, the D.C. Circuit found and the D.C. Circuit affirmed that he did personally produce anything. Are you challenging that? I understood the government to say we're not challenging the D.C. Circuit's holding that he didn't make statements. We are not challenging the finding that he didn't make the statements. But we – but the D.C. Circuit also determined, upholding the ALJ, that he did do the act. And if you look at the language of C, rule 10b-5c, he engaged in the act of sending the e-mails. And I do want to make clear that this is not simply retransmitting the statement. He sent the e-mails on behalf of the Investment Banking Division, which is exactly what his boss calculated would make the statements more misleading. I think where we're getting stuck, and then I'll stop, I promise, is that the actus reis for fraud is the act of actually deceiving another person. And the only thing that could have done that here would have been the transmission of the e-mails to other persons, right?  The statement in the abstract, you know, does nothing. It was the transmission of the e-mail, which is an act. I think if you look at the ordinary meaning of act, it would include sending an e-mail or the ordinary meaning of the verb employ in 10b-5a. But the relevant act for fraud, again, is the act of deceiving another. And, yes, and this e-mail was extraordinarily deceptive. As was commented earlier, there were three gross mischaracterizations of the company under the representation that they would provide different layers of protection. Sotomayor, just so I understand the SG's position on this issue, do you believe that Janus controls 17a-2? You didn't charge it, or it wasn't charged here. I don't know if it was — it wasn't likely you personally, but are you taking — is the SG's office taking the position that Janus controls 17a-2? No, that's not the SG's office's position. It's not the commission's position. It wasn't charged in this case. You're right, Your Honor. But we would not say that it controls 17a-2. Do you know why? I don't actually know exactly why a-2 wasn't — 17a-2 wasn't charged in this case. But the reason we wouldn't take that position is that the verb make is not in 17a-2, and that is critically the word that the Court was interpreting in Janus. On that point, I do want to make clear that Janus was self-consciously a decision only about 10b-5b. The — I think it was the second question in the oral argument in that case from Justice Sotomayor was why isn't there an A claim, a scheme claim in this case. And Petitioner's response was not that his clients wouldn't have been liable under that theory. It was that that simply hadn't arisen in the case. So Janus was clearly just deciding the meaning of B, which I do think goes to the real flaw in Petitioner's argument, which is, again, that subsection B somehow restricts the meaning of A and C in Rule 10b-5, and also somehow restricts the meaning of subsection A of a completely different statute, the Securities Act of 1933. And I do think it's a quite extraordinary argument to say that the Commission could, by adopting a rule in 1942, change the meaning of a statute that was enacted by the Congress and signed by the President in 1933. In fact, you know, this Court has repeatedly rejected that kind of field preemption or exclusive remedy argument in the securities laws, most prominently in the affiliated Ute case, where the Court says quite literally, even though Petitioner is not, or the securities seller in that case is not liable under B, he is liable under A and C, because those provisions are not so restricted. Another good example is the Herman and McLean case that we cite in our brief. There, Petitioner was the defendant, was found liable under Rule 10b-5 for misstatements or omissions in a registration statement, even though Section 11 of the Securities Act applies expressly to misstatements in registration statements. And the Court, in a quite extended discussion, said, well, we're not going to apply a theory of displacement, we're not going to apply a theory of exclusive remedies. In fact, both of the two statutes, the Securities Act and the Exchange Act, have clauses that say they're not the exclusive remedies for the securities laws. Breyer, what does fraud mean, other than trying to do something to create in the mind of the hearer or recipient a false belief that is material? I think that's a good description. Breyer, that's Black's law dictionary, it's good enough. And fine, if that's what it is, if that's what it is, there could be two ways of doing it. One, you make the statement yourself. Two, you're part of a group where someone else makes the statement, but you play a pretty important role. Indeed, you might be the boss of the group, in which case you're not a nadir or a better. So if you're not the maker, but you do, in fact, give rise to, perhaps as the boss, the false misrepresentation, wouldn't that be covered by A and C? Yes. Okay. I know that's your position. Yes. But I just wondered why this isn't fairly simple, because now what we did in Janus is we took a category of things which we thought the maker had made the false representation, and we thought, no, he wasn't the maker. But still, he might be the big boss of a group of people who, in fact, took actions or made statements to cause the false representation to arise in the mind of the I thought perhaps you would agree. I do. I do agree. I do agree, Justice Breyer. And that, it seemed to me, is your basic argument. That's correct. And we recognize there was a close decision in Janus, but I think Janus is ultimately a helpful decision for the commission. I was thinking about it that way, but I dissented in Janus, and so I don't want to be I don't want to be Well, I actually think I don't want it to be oversimplified. I think one quite simple explanation for Janus is the Court simply followed the text of the rule, and that's precisely, and there was dispute about it, but everybody agreed that you were going to interpret the text of the rule. And we believe, if you interpret the text of the rule here, it is quite clear, and Petitioner is almost conceding, I think, that his conduct falls within the meaning of A and C. It's only this argument that B somehow restricts or supersedes or preempts a charge under A and C of Rule 10b. No. The argument is that if you read A and C the way you do, Janus is a dead letter. Right? I mean, in the reply brief, the Petitioner says you never suggest any situation to which Janus would apply if your reading of 10b-5 prevails. Mr. Chief Justice, we disagree with that. If you had somebody Well, it's here. Go ahead. Well, perhaps we didn't suggest it in our brief, but, you know, if you had somebody who was far back in the chain of drafting copy, you know, for example, a marketing director who drafted copy, that it was itself not deceptive, but that that person knew would then be used in a fraud, or you had a speechwriter who drafted something that was not wrong, but he knew was later going to be used in a fraud, that person, in our view, would be an aider and abetter. That would not be a primary violation for the important reason that Rule 10b – that Section 10b itself requires a deceptive act, and simply submitting material that you know is later going to be used fraudulently would give you the requisite mens rea for liability itself, and Janus will be the critical case in those scenarios between primary liability and secondary liability. And that's, of course, essential in a private action, because there is no cause of action after central bank for aiding and abetting in a private action, and Janus would be the difference between liability and no liability for people in that situation. Now, I do – I think the Chief Justice is thinking of someone who does prior to Janus would have made a statement, and now that seemed to be excluded in Janus. And now we have a way of making, for that set of people, Janus irrelevant, because the aiding and abetting argument you just made would have existed pre-Janus or anti-Janus. One possible attitude is to say, so much the better. But that perhaps would be the dissenter's attitude. And so – so what is the answer to the Chief Justice's question, which was raised by your opponents, that it still has life and, in fact, makes a difference even for people who before and after, maybe in the private context, what is – what is the – Let me try to be clear. Before Janus, there would have been an argument that somebody far back in the chain of making a statement was a maker of the statement and was primarily liable under 10b-5b. That means there could have been a private action against that defendant. After Janus, that argument is no longer available with respect to people far back in the chain who didn't commit one of the – who don't fall within A or C as primary violators. Now, we think that's not this case, because Petitioner does fall within A and C. Robertson, you're – so the SEC would argue that somebody that prepared one of these documents that contains fraudulent material or knew that it would be used in a fraud – in other words, you would say, oh, don't worry about that, that person is not a maker, he's not going to be liable because of Janus. Before Janus, we would have said he was a maker, but we accept Janus, and now we would say that that person is an aider and abetter who could be pursued by the commission. That's – that's the Maloof decision that we've cited in our brief. Now, I do want to make the point that aiding and abetting liability will not always be available, and so it's tempting to say that that's always a fallback for the commission. First of all, of course, it's not available at all in a private right of action, which is one of the principal ways in which victims of fraud can recover money. But it's also not available even in a commission action unless there's a primary violation. You have to find the primary violator, and that distinguishes this from typical criminal aiding and abetting under 18 U.S.C. 2. So you can easily hypothesize a situation in which somebody who makes the statement, perhaps a high-up corporate executive or a board of directors, lacks the scienter required for primary liability because they don't know what's going on with the details of the financial reports. They're trusting the lower-down people to do that. And the commission can't pursue them for a primary violation because they lack scienter, and then the commission can't pursue the aider and abetter because there's no primary violator. And that would, we submit, tear a big loophole in securities fraud law, and that would be a very damaging result for the commission that I don't think Congress intended and that I don't think is within the ordinary meaning of the text here. My friend said a couple of times that, to try to draw a distinction between conduct and statements, and as some of the questioning suggests, I just don't think that holds up. To start with, the Stoneridge opinion expressly says that the Petitioner's course of conduct included both oral and written statements. So this Court has made clear that conduct can include statements. And in addition, Section 10b itself, which has been used in the case of the Petitioner case, is adding to the effect of, if it's only statements, it can't be conduct. Yeah. I don't think that can work either, and I think it was you, Justice Kagan, who suggested this. As my friend said, everything in 10b-5 has to emanate from 10b, and the only two nouns that are at issue in 10b are devices and contrivances. Now, Section 10a includes device or Rule 10b-5a includes devices, which I take him to concede is conduct. So unless his position is that all statements are contrivances and covered by 10b for that reason, I think he's conceded that statements are devices under 10b. I think what I'm – what I heard at any rate, ma'am, we can – it's an interesting question what the argument is, but I had understood it that, all right, one can create a false impression in the mind of another through conduct or through statements. All right? Here, the only thing that was alleged to create a false impression in the mind of others was this statement, and that that's the problem you have. If the only false act, the only actus reus, was a statement and he didn't make it, then what? Well, I think he didn't make the statement, the D.C. Circuit found, but he still employed the device to defraud or engage in it. He sure helped. I mean, there's no doubt about it. He did a lot to help, but he didn't engage in any independent conduct that created a false impression in the mind of the other, other than disseminate the false statement that did that. Well, I guess I might quibble with the last point, that the other than is quite important. You know, he sent the e-mail. Oh, for sure. And you've penalized him heavily and are going to be able to on anybody's account. But we're trying to draw a line here between primary and secondary, and that's where I'm stuck. Well, on the facts of this case, Your Honor, there is no secondary liability charge. So if the Court were to reverse, he would not be punished at all. We're not worried about Justice's case, are we, counsel? I did want to make that one point. You've made the point. But you can see we've got a bigger fish to fry than that, right? I agree with that, and I do think you'll see sort of higher stakes and more sophisticated frauds, but I don't think you're likely to see a sort of more egregious fraud than this, where, you know, Petitioner, in addition to transmitting the statement that was made by Greg Lorenzo, sent it as the head of the Investment Banking Division. He asked – he offered to follow up with questions. He signed it under his own name. You've got lots of mens rea, I grant you, okay? Those are acts. Well, those are acts. They are indeed acts. But if the act that created the deception in the mind of another wasn't any conduct, it was a statement, then what is the question? I suppose the answer to that is that sending an e-mail is conduct. Yeah, it took acts to get to those minds, right? Absolutely. And the act it took in particular was sending the e-mail, sending the two e-mails, without which these investors never would have been deceived. I do very strongly think that the act was what led to the deception. It helped the deception, but the deceptive – the thing that caused the deception in the mind of the other, to get back to Justice Breyer's quotation from Blacks, was the statement in the e-mail, the erroneous facts transmitted to investors in the e-mail, right? That's it. There's not – No, it can't cause the deception unless it gets to those readers. I agree with that. I mean, I suppose another way to think of it is if Petitioner had called up the investors on the phone and said, you know, I hope you just got the e-mail that I sent. This is not my statement. You know, I didn't make it. Greg Lorenzo made it. But, boy, you really want to look at it because it's a great investment opportunity. And if you have any questions, let me know. The Investment Banking Division, the bunch of – When you said – when you said – just to clarify. When you said, I agree with that, were you agreeing with Justice Gorsuch or Justice Kagan? I think it was Justice Kagan. Okay. Is there a distinction between conduct and statement? Paul. Okay. No. Yes. You know, I mean, don't we make statements all the time through conduct? Yes, of course. Thank you. Since it was a favorable question, I thought – And, you know, I think it runs in both directions. The Court has – you know, in criminal law cases, the Court has said that not every crime that, you know, involves some sort of speech, you know, necessarily raises a First Amendment concern. I think it's a well-grounded principle that conduct does include statements. I suppose a final point, as we're sort of searching for meaning for B, I do think the Court has, you know, reiterated on many occasions that even a provision that seems redundant or that doesn't add anything to the substantive scope of the law can still serve a valuable purpose by clarifying or by marking out what the heartland of the violation is. And here, if you look at the history of the securities laws, Rule 10b-5 came about 9 years after the Securities Act, which had changed the common law rule and brought disclosure and statements to the fore as a responsibility for those issuing and trading in securities. So it makes sense that Rule 10b-5b would mark out statements as a particular area of concern and would say if you can show that somebody made a statement, then you've shown liability under 10b-5. But I don't think that that in any way forecloses liability under A and C. And as I said earlier, the affiliated Ute case I think is squarely on point and says somebody can be liable under A and C even if they're not liable under B. Justice Alito's opinion, which we cited at page 36 of our brief in the Lee case from the Third Circuit, I think is helpful on this point, too. In that case, there was a statute that covered both crimes of deceit on the one hand and tax evasion on the other hand. And Justice Alito's opinion explained that a tax crime that was not evasion but still involved deceit would be covered by that statute because the enumeration of tax evasion didn't preempt the field or didn't serve as the exclusive vehicle for all tax-related claims. And I think the same analysis applies here. The statement, the enumeration of statements in Rule 10b-5b does not preempt or foreclose acts of conduct that fall within the text of the statute. If there are no further questions, we'd ask the Court to affirm. Roberts. Thank you, counsel. Four minutes, Mr. Hyman. Thank you. My friend argues that their plain language of the rule in the statute covers Mr. Lorenzo's point that we haven't cited any cases that cover simply sending an e-mail out on behalf of another would qualify for primary liability. Secondly, the loophole hypothetical that was discussed as well, and the concerns about hindering the SEC's enforcement program, are really unfounded here because the SEC, in addition to having aiding and abetting liability, also has 17a2, which covers specifically a situation where a person uses a false statement to obtain money or property. So that 17a2, it's our position, covers the concerns that the Court raised in situations where perhaps there's a big boss that's ---- Are you saying 17a2 covers this case? Are you saying that Lorenzo used this statement to obtain money or property? No. I think if that had been charged, Mr. Lorenzo would have arguments and defenses to 17a2, but the charge would have been a closer fit to what the conduct is here, and it would not have raised the serious issues with regards to undermining Congress's statutory framework with regards to aiding and abetting and the requirement to have substantial assistance, because, as Justice Gorsuch noted, Mr. Lorenzo did not engage in an inherently deceptive act. Sending an e-mail is not inherently deceptive, and our position, consistent with the circuit court majority, is that the act, in order to take Mr. Lorenzo out of the category of misstatements and into the category of A and C, has to be something that's inherently deceptive, and otherwise, it's just a matter, it's a very low bar. Why is it inherently deceptive to tell a succession of untruths? The act is the sending of the e-mail, and the conduct that occurred here with Greg Lorenzo is the actual maker of the statement. So Frank Lorenzo is essentially a conduit. He's somebody that's transmitting statements, you know, with Sienta in this case, on behalf of another, but at the same time, simply sending an e-mail is not enough to transform Frank Lorenzo into a primary violator from perhaps somebody who gave substantial assistance. And furthermore, the language of the statutes and the rules have a clear distinction between statements and conduct. And here, in order to transition Mr. Lorenzo out of that subsection B realm and into A and C and even into 17a1, there has to be some inherently deceptive conduct, such as creating a phony purchase order or a phony contract with Charles Vista to raise capital. Those are the sorts of serious conduct that Congress had in mind when they established the distinctions between primary and secondary liability. And if there are no further questions. Roberts. Thank you, counsel. The case is submitted.